Jason SEVIER, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

Carolyn Baughman, Appellant

v.

Commonwealth of Kentucky, Appellee.

Nos. 2012–SC–000238–MR, 2013–SC–000265–TG.

Supreme Court of Kentucky.

June 19, 2014.

Kathleen Kallaher Schmidt, Assistant Public Advocate, for appellants Jason Sevier and Carolyn Baughman.

Brandon Neil Jewell, Assistant Public Advocate, for appellant Carolyn Baughman.

Jack Conway, Attorney General of Kentucky, Kenneth Wayne Riggs, Assistant Attorney General, for appellee.

Opinion of the Court by chief justice MINTON.

A circuit court jury convicted Jason Sevier and Carolyn Baughman in a joint trial

of manufacturing methamphetamine, possession of a methamphetamine precursor, first-degree possession of a controlled substance, fourth-degree controlled-substance endangerment of a child, and possession of drug paraphernalia. Sevier and Baughman were sentenced to twenty and fifteen years' imprisonment, respectively. Sevier appeals the resulting judgment directly to this Court as a matter of right. Baughman's matter-of-right appeal to the Court of Appeals was transferred to this Court and consolidated with Sevier's appeal. We issue a single opinion for these consolidated appeals.

Sevier and Baughman assign multiple, nearly identical errors on appeal. They contend that (1) the convictions for manufacturing methamphetamine and possession of a methamphetamine precursor violate double jeopardy; (2) the Commonwealth did not produce sufficient evidence to support the convictions for manufacturing methamphetamine, possession of a methamphetamine precursor, and fourth-degree controlled-substance endangerment of a child; (3) the jury instructions did not ensure that each appellant was found guilty beyond reasonable doubt of every element of every charged offense; (4) the trial court erred in failing to draw randomly and remove an alternate juror from the panel before the jury began deliberations; (5) the trial court erred by failing to swear the bailiff; (6) the trial court did not have jurisdiction to order the defendants to pay restitution to the government; and (7) the trial court improperly ordered the appellants to pay court costs and a public defender fee.

We affirm all convictions for both Sevier and Baughman, excepting their convictions for possession of a methamphetamine precursor, which we vacate because we find

those convictions, when coupled with the manufacturing methamphetamine convictions, violate the double-jeopardy bar. We also reverse the trial court's imposition of court costs and fees. Accordingly, we remand the case to the trial court for entry of a judgment consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY.

Officers were dispatched to a trailer on a drug complaint. After the officers knocked and announced their law-enforcement status, Baughman emerged to speak to them. The officers informed her they were looking for Sevier. She retreated into the trailer and conferred with Sevier before returning and directing the officers to the bedroom he occupied.

As the officers entered the trailer, they immediately recognized the strong ammonia odor commonly associated with the manufacture of methamphetamine. As they entered Sevier's room, they saw lying on the bed a broken pipe that appeared to be one used to smoke methamphetamine. The pipe contained residue.

While one officer spoke to Sevier, another officer discovered two other people in the trailer—Rebecca Reeves and her seven-year-old daughter, Sally.[1] This prompted the officers to gather the occupants in the living room. At this time, the officers learned that Sevier and Reeves leased the trailer and shared one of its two bedrooms. They also found that Baughman stayed there because she had nowhere else to live. She shared the second bedroom with Sally. The officers then obtained written consent to search the trailer.

Their search produced chemicals and equipment commonly associated with

---

1. We have chosen a pseudonym to protect the identity of the child.

methamphetamine production and consumption. In the kitchen, the officers found: a pickle jar containing flakes in "meth oil"[2] that was believed to be active and still reacting, a funnel, coffee filters, liquid drain cleaner, rock salt, and a milk jug of Coleman fuel.

In Sevier and Reeves's bedroom, the officers found four glass pipes and a piece of aluminum foil with residue consistent with methamphetamine, a digital scale, a roll of duct tape, and a coffee filter with methamphetamine residue. The officers found in Baughman's purse two pieces of aluminum foil with residue consistent with methamphetamine and a third piece of foil in a notebook in the room she shared with Sally.

Officers found more evidence during a consensual search of Reeves's car parked outside the trailer. The car contained batteries with the lithium strips removed and three HC1 generators, or smoke bottles, which tested positive for hydrochloric acid. These smoke bottles are commonly used to house a chemical reaction that generates gaseous hydrochloric acid that can then be introduced into the chemical mixture like that stored in the pickle jar. This introduction spurs yet another chemical reaction that ultimately produces methamphetamine flakes. The officers determined that one of the smoke bottles had been recently used and was still reacting. The top of this bottle had been modified to accept a piece of plastic tubing that was secured by duct tape. The volatility of the

HC1 generators and the mixture in the pickle jar necessitated the deployment to the scene of an independent hazardous-waste disposal company to stabilize and remove the tainted items.

The discovery of this evidence resulted in the arrest of Sevier, Baughman, and Reeves on charges of manufacturing methamphetamine, possession of a meth-amphetamine precursor, first-degree possession of a controlled substance, fourth-degree controlled-substance endangerment of a child, and possession of drug paraphernalia. The three were tried jointly and convicted on all counts. Sevier and Baughman were sentenced to a total of twenty and fifteen years' imprisonment, respectively. Sevier appealed the resulting judgment to this Court, and Baughman appealed the judgment against her to the Court of Appeals.[3] As recommended by the Court of Appeals, we granted Baughman's request to transfer her appeal to this Court; and we consolidated it with Sevier's appeal.[4]

## II. ANALYSIS.

### A. Sevier's Convictions for Manufacturing Methamphetamine and Possession of a Methamphetamine Precursor Violate Double Jeopardy.

Sevier alleges that his convictions for manufacturing methamphetamine and possession of a methamphetamine precursor violate double jeopardy because both convictions may have been procured on the basis of his possession of pseudoephedrine.

2. Meth oil is the result of the final chemical reaction necessary to produce methamphetamine. Meth oil consists of meth flakes suspended in liquid, which is poured through a coffee filter in order to capture meth flakes, which are the end product of manufacturing methamphetamine.

3. Reeves also exercised her right to appeal to the Court of Appeals, but that appeal was

dismissed by mutual consent and is not considered in this opinion.

4. Because Sevier and Baughman make virtually identical arguments on appeal, we refer to both of them together in our analysis of their arguments as *Sevier*, except as otherwise denoted.

This issue is unpreserved, but we review it nonetheless because of its constitutional magnitude.[5]

Section Thirteen of the Kentucky Constitution states "[n]o person shall, for the same offense, be twice put in jeopardy of his life or limb[.]"[6] To determine if a person has been in jeopardy for the same offence twice, we apply the test as announced in *Blockburger v. United States*.[7] Under *Blockburger*, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not."[8] When two different statutes define the "same offense," under the *Blockburger* test, it is typically because one is a lesser-included offense of the other.[9] Accordingly, to resolve Sevier's double-jeopardy claim, we must compare the statutes under which he was convicted with the jury instructions used to reach those convictions.

Sevier was convicted of manufacturing methamphetamine under the theory that he possessed two or more chemicals or items of equipment used to manufacture methamphetamine.[10] Under this theory, one violates Kentucky Revised Statutes (KRS) 218A.1432(1)(b) when he (1) with intent to manufacture methamphetamine (2) possesses two or more chemicals or two or more items of equipment for the manufacture of methamphetamine. In reaching this end, the trial court instructed the jury for this charge as follows:

You will find the defendant(s) guilty of Manufacturing Methamphetamine under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about March 6, 2011, and before the finding of the indictment herein, he or she knowingly had in their possession with the intent to manufacture methamphetamine two or more of the chemicals and/or two or more of the items of equipment for its manufacture.

To convict Sevier of possession of a methamphetamine precursor, the Commonwealth alleged that Sevier possessed pseudoephedrine and intended to use it as a precursor to manufacture methamphetamine. Although no pseudoephedrine was found in the trailer, the Commonwealth argued that the trailer's occupants must have possessed it at some time because pseudoephedrine is a necessary ingredient of the chemical reaction taking place in the pickle jar.[11] Therefore, under the Commonwealth's theory, Sevier violated KRS 218A.1437 when he (1) possessed pseudoephedrine (2) with the intent to use it as a precursor to manufacture methamphetamine. The trial court's instruction regarding this charge read as follows:

---

**5.** *Sherley v. Commonwealth*, 558 S.W.2d 615, 618 (Ky.1977) ("[F]ailure to preserve this issue for appellate review should not result in permitting a double jeopardy conviction to stand."), *overruled on other grounds by Dixon v. Commonwealth*, 263 S.W.3d 583 (Ky.2008).

**6.** Ky. Const. § 13; *accord* U.S. Const. amend V; KRS 505.020.

**7.** 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *see also Beaty v. Commonwealth*, 125 S.W.3d 196, 210 (Ky.2003) ("Our rule against multiple prosecutions for the same course of conduct parallels the federal rule announced in *Blockburger v. United States* ").

**8.** *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180.

**9.** *Rutledge v. United States*, 517 U.S. 292, 297, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996).

**10.** *See* KRS 218A.1432(1)(b).

**11.** We assume, without deciding, that the Commonwealth provided sufficient evidence for this theory of conviction to be viable.

You will find the Defendant(s) guilty of Possession of Methamphetamine Precursors under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about March 6, 2011, and before the finding of the indictment herein, he or she had in their possession a drug product containing pseudoephedrine;

B. That he or she knew that the substance possessed by them was a drug product containing pseudoephedrine;

AND

C. That he or she intended that the drug product containing pseudoephedrine be used as a precursor to manufacturing methamphetamine.

The Commonwealth argues that there is no double-jeopardy violation here because it introduced sufficient evidence that Sevier was in possession of four chemicals other than pseudoephedrine that are used in the manufacture of methamphetamine and at least six pieces of equipment so used. Therefore, according to the Commonwealth, because the manufacturing-methamphetamine charge may be premised on Sevier's possession of equipment or chemicals other than the pseudoephedrine, upon which the precursor charge is based, then both the manufacturing and precursor charge require proof of a unique fact sufficient to satisfy the *Blockburger* test. We disagree.

A review of the statutory elements illuminates possession of a methamphetamine precursor as a lesser-included offense of manufacturing methamphetamine.[12] We base this holding on our conclusion that the manufacturing-methamphetamine and possession-of-a-methamphetamine-precursor statutes do not each "require[ ] proof of a fact which the other does not."[13] In fact, we find the only difference between the statutes is that the manufacturing-methamphetamine statute requires possession of additional contraband beyond that necessary for a possession-of-a-methamphetamine-precursor conviction. In reaching this conclusion, we focus on the statutory elements that may be viewed as distinct: the intent element and the possession element.

The manufacturing methamphetamine statute requires an individual intend to manufacture methamphetamine while the possession-of-a-methamphetamine-precursor statute requires an individual intend to use a chemical as a precursor to the manufacture of methamphetamine. That the intent to use a chemical as a precursor to the manufacture of methamphetamine necessarily contemplates the ultimate production of methamphetamine is clear. Although phrased somewhat differently, the intent elements of the crime of possession of a methamphetamine precursor and the crime of manufacturing methamphetamine do not require proof of independent facts. If any distinction may be found between the two, it is nuanced: the manufacturing-methamphetamine statute perhaps requires a finding of more complete intent to manufacture methamphetamine that necessarily encompasses the intent to use a chemical as a precursor to manufacturing methamphetamine. This highly nuanced

---

**12.** *See Rutledge,* 517 U.S. at 297, 116 S.Ct. 1241 ("[W]e have often concluded that two different statutes define the 'same offense,' typically because one is a lesser included offense of the other."); KRS 505.020(*l*)(a), (2)(a) (prohibiting multiple prosecutions when one offense is a lesser included offense of the other because "[i]t is established by proof of the same or less than all the facts required to establish the commission of the [greater] offense charged").

**13.** *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180.

distinction is insufficient to satisfy *Blockburger.*

The analysis of the possession element is not as straight forward because the manufacturing-methamphetamine statute includes alternate methods of satisfying this element. The manufacturing-methamphetamine statute allows conviction upon possession of two or more chemicals *or* two or more items of equipment for the manufacture of methamphetamine. On the other hand, the possession-of-a-methamphetamine-precursor statute requires possession of only one statutorily enumerated chemical.[14] Notwithstanding the alternate methods of proof to satisfy this element under the manufacturing-methamphetamine statute, we are not convinced that each of these elements *requires* proof of an additional fact the other does not.

The existence of alternate methods to satisfy the possession element of the manufacturing-methamphetamine statute does not neutralize the fact that possession of only one more chemical than necessary for a possession-of-a-methamphetamine-precursor conviction subjects an individual to criminal liability for manufacturing methamphetamine. Proof of possession of an additional chemical is not proof of an *independent* fact; it simply requires proof of an *additional* fact.[15] That a manufacturing-methamphetamine conviction *may* be premised upon the possession of equipment without reference to any chemicals is insufficient, by itself, to satisfy *Blockburger.* Although the manufacturing-methamphetamine statute provides an opportunity for the Commonwealth to satisfy the manufacturing-methamphetamine and possession-of-a-methamphetamine-precursor

statutes by proving independent facts, proof of independent facts is not *required.* Just as we would not allow multiple manufacturing-methamphetamine convictions to stand simply because one may be premised upon the possession of chemicals and the second upon the possession of equipment when all the contraband was contemporaneously possessed, we will not simply rely on the existence of an alternate theory of proving a single element of a criminal act to allow multiple convictions for what is essentially the same conduct.

Contemplating the conduct that each statute seeks to prevent brings our conclusion that the possession of a methamphetamine precursor is a lesser-included offense of manufacturing methamphetamine into sharper focus. Both statutes are aimed at preventing individuals from accumulating items necessary for the production of methamphetamine. Possession of a methamphetamine precursor is simply the first step down that path because it requires possession of only one element necessary to manufacture methamphetamine. As an individual accumulates more contraband as a means to manufacture methamphetamine, the criminal act becomes more severe and, thus, subjects an individual to criminal liability for manufacturing methamphetamine as opposed to possessing a methamphetamine precursor. This progression is implicitly acknowledged by the legislature in labeling manufacturing methamphetamine a greater, Class B felony and possession of a methamphetamine precursor a lesser, Class D felony.

We can envision a factual scenario where possession of a methamphetamine precursor and manufacturing methamphet-

---

14. It is undisputable that all of the chemicals listed in KRS 218A.1437(1) are considered chemicals for the production of methamphetamine and would fall within the purview of the manufacturing-methamphetamine statute.

15. *See* KRS 505.020(1)(a), (2)(a).

amine may be proved by different underlying facts—*e.g.*, by possession of different chemicals or items of equipment, as the Commonwealth argues was the case here. But we are reluctant to allow the Commonwealth to create independent facts by charging individuals with both manufacturing methamphetamine and possession of a methamphetamine precursor when the underlying act of possessing chemicals and equipment with the end of manufacturing methamphetamine is the same. It is contrary to our jurisprudence to allow multiple convictions to stand when an individual is in possession of one or more chemicals and multiple items of equipment for the manufacture of methamphetamine when the items are contemporaneously possessed and intended to be used for a singular purpose. For this reason, we hold that the possession of a methamphetamine precursor is a lesser-included offense of manufacturing methamphetamine; and, therefore, conviction for both crimes, regardless of which specific chemicals or items of equipment may underlie each crime, violates double jeopardy.[16]

■ The remedy for a double-jeopardy violation is to vacate or reverse the lesser-included charge to rectify the double-jeopardy violation.[17] This is done even when both sentences at issue are ordered to run concurrently because, while the effect of vacating the conviction has no effect on the present sentence, the "separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored."[18] Here, we have held possession of a methamphetamine precursor is a lesser-included offense to manufacturing methamphetamine, and, therefore, we must vacate that conviction to rectify the double-jeopardy violation.

## B. The Commonwealth Presented Sufficient Evidence to Convict Sevier of Manufacturing Methamphetamine and Fourth–Degree Controlled–Substance Endangerment of a Child.

Sevier alleges that the evidence produced by the Commonwealth was insufficient to allow a jury to convict him of manufacturing methamphetamine and fourth-degree controlled-substance endangerment of a child.[19] Sevier contends he preserved this argument for appellate review when his counsel joined an oral motion for directed verdict made by Co–Defendant Reeves's attorney at the close of evidence. Although the record is inconclu-

---

**16.** This holding does nothing to undermine our holding in *Shemwell v. Commonwealth*, 294 S.W.3d 430 (Ky.2009). That case involved conviction of manufacturing methamphetamine under KRS 218A.1432(1)(a), which requires an individual to have actually manufactured some amount of methamphetamine, along with a conviction for possession of a methamphetamine precursor. *Shemwell*, 294 S.W.3d at 433. Because the manufacturing-methamphetamine conviction required proof the defendant physically manufactured methamphetamine in the past and the possession of a methamphetamine precursor conviction required proof he possessed a chemical with intent to commit an act in the *future*, the dual convictions lack the factual unity with

which we presently take issue and, therefore, did not violate double jeopardy. *Id.*

**17.** *Clark v. Commonwealth*, 267 S.W.3d 668, 678 (Ky.2008).

**18.** *Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *see also Beaty*, 125 S.W.3d at 214 (reversing conviction as a double-jeopardy violation even though the sentences were to run concurrently).

**19.** Appellants also contend that there was insufficient evidence to maintain their possession-of-a-methamphetamine-precursor conviction; but because we have already vacated that conviction, we will not discuss it further.

sive on this point, we conclude that Sevier joined the directed-verdict motion, as he asserts; and the Commonwealth concedes as much.

■ Even assuming that Sevier did join Reeves's directed-verdict motion, this issue is nonetheless unpreserved for appellate review because the directed-verdict motion was too general.[20] The motion did not state to which charges it pertained, nor did it reference the specific grounds upon which the motion was based. Following our precedent, we have staunchly held that a party's failure to state the specific grounds for a directed-verdict motion "foreclose[s] appellate review."[21] Because both Sevier and Baughman have requested review under Kentucky Rules of Criminal Procedure (RCr) 10.26, we will review the alleged error for palpable error.[22] "An error is palpable only if it is 'shocking or jurisprudentially intolerable.'"[23]

### 1. It was not Error to Submit the Manufacturing–Methamphetamine Charge to the Jury.

Sevier challenges the manufacturing-methamphetamine conviction by arguing that there was insufficient evidence to prove that he intended to manufacture methamphetamine in the future because the manufacturing process had already been completed. Baughman echoes this argument but also claims the Commonwealth did not meet its burden of proving she possessed the chemicals or equipment necessary for the conviction.

■ The evidence of ample reserves of items and chemicals used in the manufacture of methamphetamine was sufficient to allow the jury to infer Sevier's intent to manufacture methamphetamine in the future. The storage of the chemical mixture in the pickle jar in close proximity to the other chemicals and items of equipment further provides a basis to infer that Sevier was participating in an on-going enterprise to produce methamphetamine as opposed to an isolated instance as he alleges. This, coupled with the various items of methamphetamine paraphernalia found in his bedroom, provides further proof upon which the jury could rely in finding that Sevier intended to produce methamphetamine in the future in order to support his addiction.[24]

---

**20.** Baughman concedes that this issue was unpreserved as to her.

**21.** *Pate v. Commonwealth*, 134 S.W.3d 593, 597–98 (Ky.2004) ("CR 50.01 requires that a directed verdict motion 'state the specific grounds therefore,' and Kentucky appellate courts have steadfastly held that failure to do so will foreclose appellate review of the trial court's denial of the directed verdict motion.").

**22.** RCr 10.26 states: "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

**23.** *Allen v. Commonwealth*, 286 S.W.3d 221, 226 (Ky.2009) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky.2006)).

**24.** *Simpson v. Commonwealth*, 759 S.W.2d 224, 226 (Ky.1988) ("The jury is allowed reasonable latitude in which to infer intent from the facts and circumstances surrounding the crime."). For instance, in the case of *Pate v. Commonwealth*, 134 S.W.3d 593 (Ky.2004), this Court held that evidence of "large quantities of ... methamphetamine precursors," along with maps listing locations of local stores that sell the chemicals necessary to produce methamphetamine, was sufficient to allow a jury to infer the defendant's intent to produce methamphetamine. *Id.* at 599; *see also Varble v. Commonwealth*, 125 S.W.3d 246, 255 (Ky.2004) (acknowledging that circumstantial evidence of a defendant's drug use and possession of drug paraphernalia is

■ Admittedly, most of the more damning evidence—the reacting pickle jar and smoke bottles—was found in property owned or leased by Sevier and Reeves; but Baughman was not the innocent bystander she claims to have been. Police found three pieces of aluminum foil with residue consistent with that of methamphetamine in her purse and in her belongings kept in the bedroom she shared with Sally. The evidence also shows that Baughman was not simply a victim ensnared while visiting the trailer. She had been staying there for weeks; was otherwise homeless; and, at the time of arrest, appeared to have been living there indefinitely. Baughman's status as a seemingly indefinite resident along with her actual possession of methamphetamine accessories presented sufficient circumstances to allow a jury to infer she possessed the intent to manufacture methamphetamine.[25]

■ The fact that the chemicals and equipment underlying the manufacturing-methamphetamine conviction were in the home of Baughman's co-defendants, and also in their possession, does not dispositively prove Baughman's lack of possession and, thereby, her innocence. Possession of dangerous drugs and, likewise, the instrumentalities used in their creation, "need not be exclusive" and may be held by more than one person.[26] This Court has previously held that the definition of

possession for the purpose of offenses in Chapter 218A includes both actual and constructive possession.[27] The Commonwealth's proof and the jury instructions reflected that definition, allowing Baughman and her co-defendants to be found to possess the contraband if it was subject to the defendant's actual "dominion and control."[28]

The evidence also clearly showed a significant number of chemicals and items of equipment were readily accessible to Baughman. This includes the chemical mixture in the pickle jar, Coleman fuel, rock salt, a funnel, coffee filters, and liquid drain cleaner. These items were all stored in the kitchen, which is a common area of the trailer openly accessible to all occupants. That Baughman could readily access the kitchen as an indefinite resident is clear. Akin to the jury's ability to infer Baughman's intent from the circumstances, this evidence is likewise sufficient to allow the jury to conclude that the instruments or chemicals required to support a conviction for manufacturing methamphetamine were subject to Baughman's control.

We cannot say that the trial court's decision to submit the manufacturing-methamphetamine charge to the jury violated Sevier's or Baughman's substantial rights. We find that the Commonwealth presented

---

"evidence of both motive and opportunity from which a jury could reasonably imply intent").

25. *See Pate,* 134 S.W.3d. at 599; *Commonwealth v. Wolford,* 4 S.W.3d 534, 539 (Ky. 1999) ("Although the prosecution in a criminal case has the burden of proving every element of the defendant's guilt beyond a reasonable doubt, we have long held that *mens rea,* specifically intent, can be inferred from circumstances.") (citations omitted).

26. *Franklin v. Commonwealth,* 490 S.W.2d 148, 150 (Ky.1972).

27. *Pate,* 134 S.W.3d at 598 ("[W]e have held that 'possession' for purposes of KRS Chapter 218A includes both actual and constructive possession.").

28. *See also Burnett v. Commonwealth,* 31 S.W.3d 878, 881 (Ky.2000) ("To prove constructive possession, the Commonwealth must present evidence which establishes that the contraband was subject to the defendant's dominion and control."), *overruled on other grounds by Travis v. Commonwealth,* 327 S.W.3d 456 (Ky.2010).

sufficient evidence to allow a reasonable jury to find that both appellants intended to manufacture methamphetamine and possessed, actually or constructively, the contraband prohibited by KRS 218A.1432.

### 2. The Trial Court did not Err in Convicting Sevier of Fourth–Degree Controlled–Substance Endangerment of a Child.

Sevier argues that his conviction of fourth-degree controlled-substance endangerment of a child cannot stand because he has no parental or custodial rights regarding Sally and, more specifically, because he had no authority to permit Sally to remain on, or remove her from, the premises during the manufacture of methamphetamine. Sevier also argues that the Commonwealth presented insufficient evidence to prove that Sally was actually present during the manufacturing of any controlled substance and was subjected to a risk of serious physical injury as a result.

### a. A parental, custodial, or special relationship with a child is not a prerequisite to criminal liability under KRS 218A.1444.

The fourth-degree controlled-substance-endangerment-of-a-child statute [29] contains no explicit requirement that the party subjecting a child to the dangers of manufacturing a controlled substance be the child's legal custodian or possess any parental rights regarding that child for criminal liability to attach. Requiring such a rela-

tionship before criminal liability may be incurred under this statute would unreasonably limit the applicable scope of the statute.

■■■ The statute rests criminal liability on those who "knowingly cause[ ] or permit[ ]" a child to be present during the manufacture of a controlled substance or methamphetamine.[30] That is, a defendant may be convicted for either knowingly "caus[ing]" or "permitt[ing]" a child to be present while a controlled substance is produced. These theories are entirely independent; and, therefore, a defendant need not authoritatively permit a child to be present during drug production in order for a conviction to lie.

Without contemplating the existence of a parental relationship, one may *cause* a child to be present during the manufacture of a controlled substance by occasioning the drug' to be produced when he knows the child is present. Under this theory, the statute permits conviction without reference to a defendant *permitting* a child to be present because he has already made the conscious decision to undertake production of a controlled substance while knowing a child is present. That is, criminal liability may be found regardless of the defendant's actual or perceived authority over a child. The defendant surely has the ability to control production when a child is present. When a defendant fails to take such prophylactic measures, he ultimately "causes ... a child to be present" during

---

**29.** KRS 218A.1444. The statute reads, in pertinent part, as follows: "A person is guilty of controlled substance endangerment to a child in the fourth degree when he or she knowingly causes or permits a child to be present when any person is illegally manufacturing a controlled substance or methamphetamine...."

**30.** *Id.* We note that the manufacture of methamphetamine or another controlled substance

is not the only way a conviction may be reached. Possessing "a hazardous chemical substance with intent to illegally manufacture a controlled substance or methamphetamine under circumstances that place a child in danger of serious physical injury or death" is a second theory of conviction contemplated in KRS 218A.1444 and is discussed in more detail below.

the manufacture of a controlled substance whether or not he has the parental authority to control the child's whereabouts.

Sevier's argument that parental authority or some form of a special relationship with a child is necessary for conviction under KRS 218A.1444 rests mainly on the legislature's use of the word *permits*. Black's Law Dictionary defines *permit* as meaning "[t]o consent to formally" or "[t]o give opportunity for."[31] Because these meanings are both contemplated in the ordinary use of the word, we must attempt to determine the legislature's intent in using the word *permits* in order to construe the statute properly.[32]

Importantly, there is no express statutory requirement that a party must possess parental rights or a special relationship with a child in order to be convicted under KRS 218A.1444. As discussed in great detail in *Staples v. Commonwealth*,[33] the legislature is well versed in limiting the applicability of statutes to those with varying degrees of parental or custodial relationships and responsibilities with regard to the children the statutes are meant to serve.[34] That the legislature expressly chose not to include any of this familiar limiting language is telling and directs us to infer a less authoritarian definition of the word *permit*. Accordingly, we find the legislature's intended definition of *permits* was "[t]o give opportunity for" and was meant to require a less formal grant of consent to the child's presence for liability to attach. We believe the legislature intended its use of *permits* to apply in situations when a party affords a child the opportunity to be present during the manufacture of a controlled substance either by delivering the child to the location where such production was taking place or by allowing the production to take place in the child's presence.

■ Based on this less-restrictive definition of *permits*, we conclude that KRS 218A.1444 does not require a party to have any actual or perceived authority over a child to be convicted under that statute. And, thereby, the trial court did not err in convicting Sevier of fourth-degree controlled-substance endangerment of a child in the absence of a parental or otherwise special relationship with Sally.

*b.* ***The Commonwealth presented sufficient evidence to allow the jury to conclude that Sally was present during the manufacture of methamphetamine.***

■ Although the Commonwealth presents minimal direct evidence that Sally was present in the trailer during the *entire* manufacturing process, there was sufficient evidence to allow a reasonable jury to infer that Sally was present during the manufacture of methamphetamine sufficient to support Sevier's conviction. The Commonwealth proffered evidence that when viewed as a whole would allow a reasonable jury to conclude that methamphetamine was manufactured in Sevier's trailer shortly before the police arrived and that Sally was present during that production.

**31.** Black's Law Dictionary 1160 (7th ed.1999).

**32.** *MPM Fin. Grp., Inc. v. Morton*, 289 S.W.3d 193, 198 (Ky.2009) ("Faced with competing interpretations of an ambiguous statute, we look to traditional rules of statutory construction.").

**33.** —— S.W.3d ——, 2014 WL 1511385 (April 17, 2014).

**34.** *See, e.g.*, KRS 508.100 (actual custody); KRS 509.070 (lawful custody); KRS 156.730 (*in loco parentis* ).

First and foremost, upon entering the trailer, the officers encountered the telltale sign of methamphetamine production—an overwhelming ammonia odor. Beyond that, the police found chemical reactions still taking place in the pickle jar found under the kitchen sink and a smoke bottle located in Reeves's trunk. The ongoing reactions and the officer's testimony that the smoke bottle was recently used supports the logical conclusion that methamphetamine was manufactured in the trailer shortly before the police arrived. That Sevier was found in his bedroom with a pipe, aluminum foil, and a coffee filter all containing residue consistent with methamphetamine use further allows the conclusion that Sevier had recently smoked methamphetamine, which coupled with the other evidence produced, supports a finding that the methamphetamine he ingested had been recently produced in the trailer.

Once the jury has established that methamphetamine was recently produced in the trailer, it is by no means a logical leap for them to conclude that Sally was present during that manufacture. It is uncontroverted that Sally was in the trailer when the police arrived. It is equally clear that the trailer was Sally's primary, and perhaps only, residence. The record also indicated that the date of the incident at issue was March 6, 2011—a Sunday. The close temporal relationship between the inferred production of methamphetamine and the arrival of the police, coupled with Sally's presence at the trailer and the date in question being a Sunday—a day when Sally would not have attended school— provides a sufficient basis for the jury to conclude that Sally was present during the manufacture of methamphetamine.

The Commonwealth having met its burden and there being no evidence to cause the jury to believe Sally was elsewhere, we conclude it was not "shocking or jurisprudentially intolerable" for the jury to infer that Sally was in the trailer during the manufacture of methamphetamine.

### c. That a child was placed in danger of serious physical injury or death is not a necessary element for conviction under KRS 218A.1444 when the Commonwealth alleges the child was present during the manufacture of a controlled substance.

 Sevier also argues that the Commonwealth did not provide sufficient evidence to prove that Sally was placed in danger of serious physical injury or death during the manufacture of methamphetamine. Upon a close reading of KRS 218A.1444, we find that this is not a necessary element of fourth-degree controlled-substance endangerment of a child when the Commonwealth alleges that a child was present during the manufacturing of a controlled substance. We feel that under a proper reading of the statute, danger to a child is only an element when the prosecution is based upon the defendant's possession of a hazardous chemical substance.

KRS 218A.1444(1), which sets forth the elements of the crime, reads as follows:

> A person is guilty of controlled substance endangerment to a child in the fourth degree when he or she knowingly causes or permits a child to be present when any person is illegally manufacturing a controlled substance or methamphetamine *or* possesses a hazardous chemical substance with intent to illegally manufacture a controlled substance or methamphetamine under circumstances that place a child in danger of serious physical injury or death, if the child is not injured as a result of the commission of the offense.[35]

---

35. KRS 218A.1444(1) (emphasis added).

The legislature's use of the disjunctive *or*, as emphasized above, delineates the co-existence of two distinct and independent acts that may subject a party to criminal liability under the statute.

The first theory of conviction, the clause preceding the disjunctive *or*, states that a person has committed the offense when (1) "he or she knowingly causes or permits" (2) "a child" (3) "to be present when any person is illegally manufacturing a controlled substance or methamphetamine[.]" This clause contains both of the quintessential elements necessary for a criminal conviction: *mens rea*, or mental state, and *actus reus*, an overt act. In this clause, the mental state is "knowingly" while the overt act is causing or permitting a child to be present during manufacture of a controlled substance. No additional elements are necessary for this clause to be recognized as a proper, standalone criminal law under our jurisprudence.

The clause following the disjunctive *or* contains the second theory of prosecution that is available under KRS 218A.1444(1). This clause makes it a criminal offense to (1) possess a "hazardous chemical substance with intent to illegally manufacture a controlled substance or methamphetamine" (2) "under circumstances that place a child in danger of serious physical injury or death[.]" Again, this clause independently contains both elements necessary to support a criminal conviction. Interestingly, however, the overt act is possessing a hazardous chemical with the intent to manufacture a controlled substance; and the necessary mental state is supplied by the dependent clause "under circumstances that place a child in danger of serious physical injury or death[.]" This risk-of-injury element supplies the mental state element in the form of wantonness.

Although the statute lacks punctuation that would assist our reading of KRS 218A.1444(1), our focus lands on the divisive *or* that splits the statute into two separate avenues of committing fourth-degree controlled-substance endangerment of a child. This distinction creating two independent acts that the legislature has deemed worthy of criminal punishment makes clear that the risk-of-danger element is only applicable when the theory of conviction is based upon the mishandling of a dangerous chemical substance as opposed to the actual manufacture of a controlled substance. The fact that the risk-of-danger element provides the necessary *mens rea* in the former circumstance further clarifies that it was intended only to apply to the clause following the disjunctive *or* instead of being an element that applies uniformly throughout the statute.

 Reading the statute to require proof of danger to a child, although logical given the title of the statute, would require grammatical gymnastics and require a defendant to possess multiple mental states in order to be convicted under the manufacturing theory in KRS 218A.1444(1). We endeavor to prevent such absurdities from being read into statutes, and we decline to do so here. Accordingly, we conclude that KRS 218A.1444(1) does not require proof of danger to a child when conviction is grounded in the manufacture of a controlled substance in the presence of a child. Because Sevier's present allegation of insufficient evidence is premised on a decidedly extraneous element, we find it was not error for the trial court to submit the fourth-degree controlled-substance endangerment of a child charge to the jury.

C. There was no Error in the Jury Instructions.

 Sevier's next assignment of error alleges that the jury instructions for each offense were not drafted to ensure every element was proved beyond a reasonable

doubt. Because the defendants were jointly tried and the instructions pertaining to each offense named all three defendants before listing the elements of the offense, Sevier argues that the jurors may have been confused and believed that if they found any one defendant guilty of the offense, all defendants must be found guilty. Sevier concedes that this issue is unpreserved and requests review under RCr 10.26. We again review for palpable error.[36]

Sevier takes issue with the jury instructions for each charged offense; but because his allegation of error pertains more to the general form of the instructions as opposed to the specific content, we will discuss the instructions in generalities without reproducing all the instructions here. All the jury instructions were phrased in similar fashion to the instruction that follows, with emphasis given to the words and phrases with which Sevier specifically takes issue:

### INSTRUCTION NO. 3

### COUNT 1

### Manufacturing Methamphetamine As to Jason Sevier, Nicole Reeves, Carolyn Baughman

You will find the *defendant(s)* guilty of Manufacturing Methamphetamine under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about March 6, 2011, and before the finding of the indictment herein, *he or she* knowingly had in their possession with the intent to manufacture methamphetamine two or more of the chemicals and/or two or more of the items of equipment for its manufacture.

Sevier argues that the trial court's use of the phrases "You will find the defendant(s) guilty" and "he or she" in the instructions insinuated that the jury could convict all three defendants of an offense upon finding one defendant guilty of all the elements, even though no complicity or accomplice liability theories were presented at trial. We do not read the instructions in this manner.

In order to read the jury instructions in the manner that Sevier contends, the additional *(s)* on the end of *defendant(s)* would be unnecessary; and the instruction would merely read "defendants" because all would be treated singularly. The court's addition of the parenthetical plural on the end of *defendant(s)* indicated that a singular defendant or any number of multiple defendants may be found guilty under each instruction, thus, proving the diametrically opposite point from that which Sevier argues.[37] Also, the use of the disjunctive "he *or* she" further clarifies that each defendant is to be considered on his or her own as opposed to all defendants being considered as a single entity as Sevier argues. Lastly, and perhaps most importantly, there was an individualized verdict form for each defendant regarding each offense. Therefore, when rendering their

---

**36.** *See Allen,* 286 S.W.3d 221. Our recent holding in *Martin v. Commonwealth,* 409 S.W.3d 340 (Ky.2013), does not operate as a total bar to judicial review in this instance because Sevier's allegation of error rests in the *content* of the instruction given as opposed to whether or not a specific, yet unrequested, instruction should have been given. *See id.* at 346.

**37.** Bryan A. Garner, Garner's Dictionary of Legal Usage 685 (3d ed. 2011) ("The purpose [of a parenthetical plural] is to indicate that the statement applies to one or more members of a category."); William A. Sabin, The Gregg Reference Manual § 626 (9th ed.2001) ("When referring to an item that could be either singular or plural, enclose the plural ending in parentheses.").

verdict, the jury was explicitly required to determine the guilt of each defendant individually.

To believe that the jury understood the instructions as requiring anything other than an individualized determination of guilt would not only require a tortured reading of the instructions but would also offend the common sense of the jurors of the Commonwealth. Although the instructions may have been written in a manner as to alleviate Sevier's fears of jury confusion [38] (which, perhaps, may have occurred if any of the co-defendants tendered alternative instructions or appropriately objected at trial), we cannot find that the instructions as given constituted palpable error.

### D. The Trial Court's Failure to Designate and Excuse an Alternate Juror Before Sending the Jury to Deliberate was not Palpable Error.

At the start of this joint trial, the trial court seated thirteen jurors to hear the evidence, a practice authorized by Kentucky Rules of Criminal Procedure (RCr) 9.32(1). Seating more that the minimum number of twelve jurors to hear the evidence is a routine precautionary measure taken by trial courts against the situation that might occur should one or more jurors be unable to complete the trial, reducing the number of jurors below the requisite twelve-member jury to decide the case.

When a trial court chooses to seat more than twelve jurors, all of them are sworn as members of the petit jury; and all of them participate as such until immediately

before the trial court submits the case to the jury for deliberations. At that point, Civil Rule (CR) 47.03 requires the court clerk to reduce the jury to twelve by selecting at random those to be declared the alternates and dismissed from the jury. But, in this case, the trial court erroneously failed to select an alternate at the time contemplated by CR 47.03. The jury retired to the jury room, completed deliberation, and announced that it had reached a verdict in the guilt phase of the trial before the trial court and the parties discovered that an alternate juror had not been selected and excused from the jury.

Sevier frames this issue as an alternate invading the sanctity of the jury room; but it is more properly framed as the trial court's failure to select and dismiss an alternate juror, effectively expanding the number of deliberating jurors from twelve to thirteen.

Because this issue has not faced appellate-court scrutiny in Kentucky for nearly two hundred years, Sevier urges this Court to look to other states that presume prejudice when more than twelve jurors participate in deliberation. This appears to be the majority position among the jurisdictions that have tackled this issue because most of them have opted to apply either a rebuttable or an irrebuttable presumption of prejudice to the defendant. In advocating for the application of a presumption of prejudice, Sevier relies on two cases from other jurisdictions: *McAdams v. State*[39] and *Stokes v. State*.[40]

In *McAdams v. State*, the Wyoming trial court empanelled thirteen jurors—the required twelve, plus an extra to be labeled

---

**38.** *See* Bryan A. Garner, Garner's Dictionary of Legal Usage 685 (3d ed.2011) ("But the practice [of using parenthetical plurals] produces serious drafting problems.... Using *(s)* as a shortcut produces ungainly, unsightly sentences....").

**39.** 75 P.3d 665 (Wyo.2003).

**40.** 379 Md. 618, 843 A.2d 64 (Md.Ct.App. 2004).

an alternate and removed before deliberations. The trial court failed to select the alternate from the jury and inadvertently allowed all thirteen jurors to begin deliberating. When the thirteen-member jury was later brought to the trial court's attention, by agreement of the parties, the court randomly selected a juror to be designated the alternate and removed him from the deliberating jury. Without any further instruction or admonition from the trial court, the remaining twelve jurors resumed deliberations, ultimately rendering a guilty verdict.

On review, the Wyoming Supreme Court, following its precedent based on *United States v. Olano*,[41] found that an alternate's presence in the jury room was not per se reversible error and applied a two-prong test to determine if there was plain error. As part of this two-prong test, the court first considers whether the alternate's presence prejudiced the defendant and then whether the court took corrective steps to obviate the risk of prejudice caused by the alternate's presence.

In assessing the prejudice to the defendant, the *McAdams* court announced that an alternate's mere presence during deliberations is not prejudicial in and of itself. The court instead focused on whether or not the juror participated in deliberations. The court then concluded that when an alternate is present during deliberations, "participation either by words or gestures must be presumed to have occurred."[42]

This presumptive participation then bred a presumption of prejudice because the Wyoming Rules of Evidence prohibit a court from probing the minds of jurors to determine if the alternate's participation had any impact on the jury's verdict. This reasoning effectively results in prejudice being presumed upon a mere showing that an alternate was present during deliberations. To overcome this presumption, the prosecuting authority must "show that the prejudicial influence of the alternate juror's participation in deliberations had no effect on the jury's final verdict[,]" or that sufficient procedural safeguards were employed by the trial court to ensure the alternate had no impact on the ultimate verdict.[43] In concluding that the defendant was manifestly prejudiced, the court held that the alternate's presence in the jury room implicated the defendant's right to a fair trial by violating "the cardinal principle that the deliberations of the jury should remain private and secret in every case[.]"[44]

The opinion of the Maryland Court of Appeals in *Stokes v. State* represents a slightly different approach. In *Stokes*, the court held that when an alternate, labeled such before submission of the case to the jury, is present during deliberations, an improper outside influence is injected into the jury deliberations because alternates "have no legal standing as jurors[.]"[45]

---

41. 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The court in *McAdams* cites *Hoos v. State*, 75 P.3d 609 (Wyo.2003), as one of the cases establishing the framework for analyzing alternate juror issues under Wyoming law. Though *McAdams* itself is void of any citation to *Olano*, *Hoos* cites that case almost exclusively in reasoning that an alternate's participation in deliberations is presumptively prejudicial. *See id.*

42. *McAdams*, 75 P.3d at 668 (quoting *Hoos*, 75 P.3d at 614).

43. *Id.* Interestingly, the safeguards that the *McAdams* court recognizes as potentially allowing the prosecution to overcome the presumed prejudice are similar to those discussed by this Court in *Crossland v. Commonwealth*, 291 S.W.3d 223 (Ky.2009).

44. *McAdams*, 75 P.3d at 669.

45. *Stokes*, 843 A.2d at 76.

In reaching this conclusion, the court determined that although alternate jurors are drawn from the same pool and have the same qualifications as jurors, Maryland rules "clearly distinguish between alternate jurors and regular jurors[.]" [46] As a result, alternate jurors "clearly are *different* than regular jurors ... and, in a sense, their status is that of a third party." [47] On the basis of this stranger-to-the-proceeding analysis, the court held that the presence of an alternate-stranger "breach[es] the sanctity and privacy of the jury deliberations" and undermines the reliability of the verdict because alternates lack accountability and personal responsibility for the ultimate verdict. [48] Applying this reasoning, the court concluded that the mere presence of an alternate in the jury room "creates a presumption of prejudice that is effectively unrebuttable[.]" [49]

Sevier relies primarily on these cases in urging us to adopt the stranger-to-the-proceedings rationale and conclude that an alternate's presence during deliberations is presumptively prejudicial. Although the analysis Sevier advances is logically compelling when applied in scenarios factually aligned with *McAdams* and *Stokes*, he fails to recognize a fundamental factual difference between those cases and the instant case. The factual difference here turns on the treatment of the extra jurors before the jury announced its verdict. In both *McAdams* and *Stokes*, the alternate jurors were identified and labeled a stranger to the jury room and the verdict. That is different from the manner in which the alternate was selected in Sevier's case because Kentucky law considers all thirteen jurors to be fully participating members of the petit jury until one is randomly selected to be dismissed as the alternate. [50]

This distinction, while seemingly benign, causes a fault in applying to Sevier's case the logic relied upon by those jurisdictions employing a presumption of prejudice. Those jurisdictions, like in *McAdams* and *Stokes*, heavily rely on the presumed chilling effect that a named or removed alternate may have on candid discussions taking place in the jury room. The presence of a "stranger" during deliberations is often viewed as a threat to the jury's secrecy and ability to engage in free discussion as a cohesive group without worry of later dissemination. But, in Kentucky, when the complement of thirteen jurors is permitted to deliberate without an alternate being named or removed before reaching a verdict, there is there is no stranger in the jury room. Instead, the jury constitutes all thirteen members who, as in Sevier's case, endeavor to reach a unanimous verdict for which all members are accountable.

That is, there can be no stranger to the proceedings because absent the court labeling a juror as such, each juror was a potential alternate. Further, the concerns that other courts have expressed regarding the potential chilling effect or risk of dissemination of confidential information regarding deliberations are unfounded when all thirteen members are considered to be, and treated as, jurors. When none

---

46. *Id.* at 72.

47. *Id.* at 73.

48. *Id.*

49. *Id.* at 78. The court proposed the extremely narrow circumstances in which the presumption of prejudice may be overcome.

They include circumstances where the alternate was not in the jury room when the door closed, or where the alternate only momentarily entered the jury room to collect personal belongings and left the room before deliberations began. *Id.*

50. *See* CR 47.03.

of the thirteen jurors is operating under the status of alternate, the discussion and verdict information that courts who presume prejudice are concerned with protecting belong just as much to the thirteenth juror as they do the other twelve because the thirteenth juror played just as much of a role in reaching the verdict and as the other twelve jurors.

Because of the factual distinction between this case and the facts that lead to the presumption of prejudice under the stranger-to-the-proceeding line of cases, we do not feel compelled to apply their reasoning in the instant case.[51] We instead find the reasoning espoused in *Crossland v. Commonwealth*[52] to provide a more appropriate standard for reviewing alternate juror errors.

■ *Crossland* held that the traditional harmless-error analysis is applicable in the closely analogous situation of post-submission substitution of an alternate juror.[53] The Court in *Crossland* recognized that RCr 9.24 "mandates that 'no error or defect in any ruling . . . or in anything done or omitted by the court . . . is ground for granting a new trial or for setting aside a verdict . . . unless it appears to the court that the denial of such relief would be inconsistent with substantial justice.' "[54] The Court further acknowledged, "virtually all errors . . . are subject to harmless error analysis," noting that even issues of constitutional import are adjudged under that standard.[55] Finding no persuasive reason to address the issue under any other standard, "we conclude that it is both permissible and appropriate"[56] to analyze this issue under the harmless error standard. That is, of course, assuming the error is properly preserved. Absent proper preservation, the error should be analyzed for palpable error under RCr 10.26.

■ With this standard in mind, we turn to an analysis of the facts before us. When the extra-juror error came to Sevier's attention after the jury announced it had reached a verdict but before the verdict was announced, he did not object.[57] This issue is, therefore, unpreserved. As a result, we review this alleged error under the palpable error standard.[58] "An error is palpable only if it is 'shocking or

---

51. That is not to say that this reasoning would not be persuasive if an alternate invades the jury room after being labeled as such or if an alternate is named and removed after deliberations began, yet, before a unanimous verdict is reached. But because those factual scenarios are not presently before the Court, we do not express any opinion on the presumption of prejudice in such instances.

52. 291 S.W.3d 223 (Ky.2009).

53. *Id.* at 232.

54. *Id.* at 231 (quoting RCr 9.24).

55. *Id.*

56. *Id.* at 232.

57. Before the verdict was announced, an alternate was randomly selected and dismissed from the petit jury. Upon reading the verdict, neither Sevier nor the Commonwealth requested the jury be polled. After hearing additional sentencing-phase evidence, the newly constituted twelve-member petit jury retired to contemplate its sentencing recommendation. Sevier did not object to this procedure at the time and does not presently claim it was error for him to effectively be tried and sentenced by different juries. Though this issue is not presently before us, we note that this Court has previously held that defendants are not entitled to have the same petit jury determine guilt and recommend punishment. *See Jacobsen v. Commonwealth*, 376 S.W.3d 600, 612 (Ky.2012); *Williamson v. Commonwealth*, 767 S.W.2d 323, 326 (Ky.1989).

58. *See* RCr 10.26.

jurisprudentially intolerable[ ]' " [59] and Sevier can show a "probability of a different result or [an] error so fundamental as to threaten [his] entitlement to due process of law." [60]

Because an error of constitutional magnitude clearly satisfies the palpable error requirement, we first address Sevier's allegation that he was constitutionally entitled to a jury of exactly twelve jurors.

Section Seven of the Kentucky Constitution states that "[t]he ancient mode of trial by jury shall ... remain inviolate, subject to such modifications as may be authorized by this Constitution." [61] As explained in *Commonwealth v. Simmons*, [62] the inclusion of the phrase, "the ancient mode," was clearly intended to maintain the constitutional import of the traditional practice of using a twelve-person jury. [63] The record of the Constitutional Convention made this intent clear, with representatives believing that removing the phrase "ancient mode" from the constitution would send a signal to the judiciary that "the change in language was intended to reflect a change in the law, a departure from the common-law jury in favor of a legislative jury[.]" [64] Be-

cause of this unequivocal intent, we held in *Simmons* that Section Seven of the Kentucky Constitution entitles defendants to a twelve-person jury.

■ Although it is clear that absent a personal waiver, it is a violation of Section Seven of the Kentucky Constitution for a defendant to be tried by a jury of less than twelve members, this principle of Kentucky Constitutional law has only been applied where defendants were tried by juries comprised of less than twelve jurors. We have found no cases decided since the adoption of the present constitution that assess the constitutionality of a jury verdict procured by the unanimous decision of thirteen qualified jurors. We now have occasion to determine if this "occult virtue in the number twelve[ ]" [65] equally applies when a defendant is provided with more than twelve jurors.

This country's reliance on twelve jurors as the cornerstone of the trial by jury has been labeled "a historic[ ] accident" [66] because of the minimal insight we have into its origins. [67] As the Supreme Court noted in *Williams v. Florida*, many of these justifications "rest on little more than mys-

59. *Allen v. Commonwealth*, 286 S.W.3d 221, 226 (Ky.2009) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky.2006)).

60. *Martin*, 207 S.W.3d at 3.

61. Ky. Const. § 7.

62. 394 S.W.3d 903 (Ky.2013).

63. *Id.* at 906. ("Kentucky had already had three Constitutions ... and in each and all of them are the words 'the ancient mode of trial by jury shall remain sacred.' What does that mean? It means every man who is put upon trial ... shall have a trial before a jury of twelve persons, and that they shall return a unanimous verdict.") (quoting *Official Re-*

*ports of the 1890 Constitutional Convention* at 1154–55 (Mr. Carroll, Henry County)).

64. *Id.* at 906–07.

65. *Official Reports of the 1890 Constitutional Convention* at 4788 (Mr. Washington, Campbell County).

66. *Williams v. Florida*, 399 U.S. 78, 87, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

67. "At the beginning of [the] thirteenth century twelve was indeed the usual but not the invariable number. But by the middle of the fourteenth century, the requirement had probably become definitely fixed. Indeed this number finally came to be regarded with something like superstitious reverence." *Id.*

tical or superstitious insights into the significance of '12.' " [68] One such example is the connection drawn by Lord Coke between the number twelve and the holy writ, with particular reference to "12 apostles, 12 stones, [and] 12 tribes[.]" [69] Regardless of the reason behind twelve-member juries being given a constitutional prominence, case law is full of references to larger juries as favoring criminal defendants.

This notion was recognized as long ago as 1898 by the Supreme Court in *Thompson v. Utah*. [70] In that case, the Supreme Court held it was a violation of the ex post facto clause for the newly created State of Utah to try a defendant by a jury of eight when he would have been entitled to a jury of twelve at the time he committed his crime. [71] The Court concluded that this reduction in number of jurors took "from the accused a substantial right belonging to him when the offense was committed" and "alter[ed] the situation of the accused to his disadvantage." [72] It was later more succinctly stated that "the reduction in the size of the jury made it easier for the State to obtain a unanimous verdict against a defendant[.]" [73]

This belief that larger juries provide more protections did not subside with the 19th Century and *Thompson*. In its seminal case regarding the number of jurors required to satisfy the Sixth Amendment right to a jury trial, the Supreme Court again acknowledged that it "might be suggested that the 12–man jury gives a defendant a greater advantage since he has more 'chances' of finding a juror who will insist on acquittal and thus prevent conviction." [74] Larger juries also reflect a greater community participation in the determination of guilt or innocence and increase the number of viewpoints represented on the jury. [75] This view is also recognized in the fact that no state provides for a jury of less than twelve in capital cases—an "implicit recognition of the value of the larger body as a means of legitimating society's decision to impose the death penalty[ ]" or other punishment. [76]

 Based on the foregoing, today we choose to deviate from the strict application of the twelve-member jury rule as a constitutional question in instances where

at n. 19 (quoting A. Scott, Fundamentals of Procedure in Actions at Law 75–76 (1922)).

68. *Id.* at 88, 90 S.Ct. 1893.

69. *Id.*

70. 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898).

71. *Id.* at 352–53. *Thompson* has since been overruled by *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). That case, however, did not disturb the *Thompson* court's findings that fewer jurors are disadvantageous to defendants. Instead, *Collins* held that procedural issues such as the number of jurors a defendant is entitled to do not fall within the scope of the ex post facto bar. Under the interpretation of the ex post facto clause announced in *Collins*, judicial review is more focused on legislation that has to do with "the definition of crimes, de-

fenses, or punishments[.]" *Id.* at 51, 110 S.Ct. 2715.

72. *Thompson*, 170 U.S. at 351, 18 S.Ct. 620.

73. *Collins*, 497 U.S. at 58–59, 110 S.Ct. 2715 (Stevens, J., concurring).

74. *Williams*, 399 U.S. at 101, 90 S.Ct. 1893. The Court further postulates that an additional juror may also present a benefit to the State because it similarly takes only one juror to prevent a defendant's acquittal. *Id.* We find the former supposition to be more compelling, however, because of the more onerous burden placed on the prosecution in a criminal matter.

75. *See id.* at 100–01, 90 S.Ct. 1893.

76. *Id.* at 103, 90 S.Ct. 1893.

that number is increased.[77] Section Seven of the Kentucky Constitution and our case law construing that provision make clear that a defendant is entitled to a jury of twelve. It is equally clear that both state and federal constitutional protections serve as a "floor" in setting the minimum level of protections that must be afforded to citizens.[78] As a result, states are free to provide citizens with additional protections above-and-beyond the constitutional "floor" without contravening the constitution or its intent. We hold that the trial court erred in allowing a thirteen-person jury to deliberate in determining Sevier's guilt, but the error was not an error of constitutional import because it provided Sevier with protections in excess of those mandated by Section Seven of the Kentucky Constitution.

The conclusion we reach today is not without support in our own jurisprudence. In the case of *Ross v. Neal,*[79] our predecessor court was required to decide the same issue—whether it was error for a defendant to be tried by a jury of thirteen instead of the "ancient mode" of twelve.[80] In a time when the ancient mode of jury trial by twelve jurors was held so sacred that defendants were not permitted to waive their right to a jury trial or to a trial without the full complement of twelve ju-

rors,[81] the *Ross* court concluded that "the party had his twelve, and one more[.]"[82] Consistent with our later holding in *Simmons,* the *Ross* court also opined that "if there were not twelve [jurors], but a deficit in the number, it might vitiate the verdict[.]"[83] It was also found that the defendant could not be found to have been prejudiced by the thirteenth juror improperly influencing the verdict because "that influence by one man too many, was exercised upon the real number, under the sanction of an oath, for the whole thirteen were equally sworn."[84]

 Absent an error of constitutional magnitude, we cannot find that the trial court error was anything other than harmless and certainly not jurisprudentially intolerable to the level of palpable error because the verdict was unanimous. Sevier makes no concrete factual allegations from which prejudice may be derived in the absence of a presumption or inference of prejudice. In fact, it was the Commonwealth that was most clearly at risk by the inclusion of the thirteenth juror. Even though the jury contained an additional juror, the Commonwealth nonetheless bore the burden of proving Sevier's guilt beyond a reasonable doubt and obtaining a

---

**77.** To be sure, our holding today is not meant to be read as overruling or diminishing the precedential value of our holding in *Commonwealth v. Simmons,* 394 S.W.3d 903 (Ky. 2013).

**78.** *See Commonwealth v. Wasson,* 842 S.W.2d 487, 492 (Ky.1993) (noting that the federal constitutional protections constitute "floor" of guaranteed individual rights); *Commonwealth v. Jeffries,* 95 S.W.3d 60, 69 (Ky.2002) (Johnstone, J., dissenting) ("Statutory protections, however, may exceed the constitutional baseline....").

**79.** 23 Ky. 407 (Ky.1828).

**80.** *Ross* was decided while the Second Constitution of Kentucky, enacted in 1799, was still

in force. This constitution nonetheless contained language requiring that "the ancient mode of trial by jury shall be held sacred[.]" Ky. Const. of 1799, art. X, § 6.

**81.** *See, e.g., Short v. Commonwealth,* 519 S.W.2d 828, 832–33 (Ky.1975) (holding, for the first time, that a defendant may waive his right to twelve jurors, so long as it is done "understandingly ... and voluntarily").

**82.** *Ross,* 23 Ky. at 408.

**83.** *Id.*

**84.** *Id.*

unanimous verdict of guilty in order to achieve a conviction. So we do not find the trial court's failure to reduce the jury to twelve to be reversible error.

### E. The Trial Court's Failure to Swear the Bailiff was not Palpable Error.

RCr 9.68 requires the trial court to place the officer in charge of the jury under oath before entrusting him with control of the jury.[85] The record before us does not include any action by the trial court to comply with this requirement, and Sevier alleges that this is reversible error. The issue is unpreserved, and we review for palpable error.[86]

That it is error for a trial court to fail to comply with RCr 9.68 is clear.[87] But in an effort to show the error was palpable, Sevier only makes conclusory allegations that the error violated his due process rights and "seriously" affected the fairness of the proceeding without alleging more. We have previously held that error in complying with RCr 9.68 is not reversible when the bailiff nonetheless properly preformed his duties under RCr 9.68.[88] Sevier has the burden of proving prejudicial error but

has not provided any evidence, or even a fact-based allegation, that the unsworn bailiff was derelict in his duty to keep the jury together and protect them from outside communications.

We will not presume an error that sufficiently impacts Sevier's substantial rights as to rise to the level of palpable error.[89] So we find that the trial court's failure to swear the bailiff responsible for the jury in accordance with RCr 9.68 was not palpable error in this instance.

### F. The Trial Court did not Abuse its Discretion in Ordering Sevier to Pay Restitution for the Cost of Cleaning up the Active Methamphetamine Labs.

At sentencing, the trial court ordered each of the three co-defendants[90] be held jointly and severally liable to pay restitution for the cost of cleaning up the active chemical reactions and chemically tainted articles found at the trailer. This cleanup amounted to a total of $2,407.38. Sevier argues this was improper because restitution may only be granted in favor of

---

85. RCr 9.68 provides: "When the jury is kept together in charge of officers, the officers must be sworn to keep the jurors together, and to suffer no person to speak to, or communicate with, them on any subject connected with the trial, and not to do so themselves."

86. See RCr 10.26.

87. Mason v. Commonwealth, 463 S.W.2d 930 (Ky.1971) ("We hold that the failure of the trial judge to administer the oath required by RCr 9.68 to the officers in charge of the jury . . . was clearly an error.").

88. See id.; Cole v. Commonwealth, 553 S.W.2d 468, 471 (Ky.1977) ("It is not reversible error in failing to administer the oath to the officer having charge of the jury where that officer actually performs his duties.").

89. See McCrobie v. Commonwealth, No. 2005–SC–000886–MR, 2006 WL 2987082 (Ky.2006)

("McCrobie gives no argument that the bailiff failed to perform his duty. We will not presume error when the burden remains on the complaining party to bring forth, at a minimum, some affirmative indication that the bailiff did not perform his duty."); Thacker v. Commonwealth, No. 2004–SC–000517–MR, 2005 WL 2675001 (Ky.2005) ("In this case, Appellant has provided no evidence to support any conclusion that the bailiff was derelict in his duties. Thus, given this court's holdings in Cole and Mason, supra, there being no proof, or allegation of any specific misconduct, we cannot, in good faith, find any violations or failures which would affect the substantial rights of the parties. . . .").

90. Appellants, Jason Sevier and Carolyn Baughman, were jointly tried with Nicole Reeves, the other leaseholder of the trailer.

a victim of the crime, and the Commonwealth is not contemplated as a victim for the purposes of restitution.[91]

KRS 532.032 grants the trial court the authority to establish restitution orders in criminal cases. *Restitution* is defined as "any form of compensation paid by a convicted person to a victim for counseling, medical expenses, lost wages due to injury, or property damage and other expenses suffered by a victim because of a criminal act[.]"[92] We have also explained that restitution is not meant to be an "additional punishment exacted by the criminal justice system.... It is merely a system designed to restore property or the value thereof to the victim."[93]

The sole authority for Sevier's argument that the Commonwealth is not contemplated as a victim for purposes of restitution is the Court of Appeals case styled *Vaughn v. Commonwealth.*[94] In *Vaughn,* the Court of Appeals held that the trial court exceeded its statutory authority in ordering defendants to pay restitution for expenses the Commonwealth incurred to extradite the defendants to Kentucky.[95] In so holding, the Court of Appeals determined that "the Commonwealth simply was not a victim who suffered a loss as a result of criminal acts committed by the Appellants[.]"[96] Sevier argues for broad application of *Vaughn,* but we read the case to apply in a more limited set of factual circumstances. We find the ex-

penses connected with extradition proceedings are more properly associated with the costs of prosecuting a crime than an "expense[ ] suffered by a victim because of a criminal act[.]"[97]

It has long been held that remedial statutes, such as the one authorizing the imposition of restitution, are to be broadly construed to effectuate their remedial purpose.[98] Although many vice crimes are commonly referred to as "victimless" crimes, the Commonwealth—and society as a whole—are ultimately harmed by these crimes. So we find that the trial court acted within its discretion in ordering the co-defendants at trial, jointly and severally, to pay restitution to reimburse the Commonwealth for the expense it incurred in cleaning up the dangerous chemical condition caused by their making methamphetamine.

■ We strongly advise, however, that trial court discretion is not boundless in this area. We are of the opinion that restitution may only be paid to the Commonwealth or local government agencies to recoup the cost of carrying out police activities when the expenses are extraordinary and fall outside the scope of typical expenses inherent in police work. For example, in the present case, the law enforcement officers were not qualified to dismantle the active meth lab and dispose of the toxic materials. Ultimately, law enforcement had to contract an indepen-

---

**91.** Sevier also makes a cursory allegation that the imposition of restitution violates his due process rights. As this argument presents no more than a thinly veiled, half-hearted attempt at utilizing Constitutional buzzwords without citing any facts or law to support the allegation, we will not review it.

**92.** KRS 532.350(2)(a).

**93.** *Commonwealth v. Bailey,* 721 S.W.2d 706, 707 (Ky.1986).

**94.** 371 S.W.3d 784 (Ky.App.2012).

**95.** *Id.* at 785–86.

**96.** *Id.* at 786.

**97.** KRS 532.350(1)(a).

**98.** *See, e.g., Commonwealth v. Morseman,* 379 S.W.3d 144, 148 (Ky.2012); *Ky. Ins. Guar. Ass'n v. Jeffers ex rel. Jeffers,* 13 S.W.3d 606, 611 (Ky.2000).

dent hazardous-waste disposal company to dispose of the chemically tainted materials in order to ensure that the chemically volatile reactions and articles no longer posed a danger to the community and environment.[99]

We find that the expenses incurred in connection with the neutralization and disposal of methamphetamine production, especially the well-documented precautions that must be undertaken to ensure the safety of the police and general public during this process, fall outside the scope of typical police duties. Thus, these expenditures qualify as "expenses suffered by a victim because of a criminal act[.]"[100] Accordingly, we affirm the trial court's order of joint-and-several restitution in the amount of $2,407.38.

### G. The Trial Court Erred When it Assessed Court Costs and a Partial Public Defender Fee.

Lastly, Sevier takes issue with the trial court's imposition of court costs and a partial public defender fee. He argues that the trial court orally waived court costs at the sentencing hearing, yet the final judgment did not reflect such a waiver. He also argues that the trial court

never held the statutorily required hearing to determine if he was able to pay a partial public defender fee. Although unpreserved, this is a sentencing issue that cannot be waived by failure to object.[101] "Thus, we review for clear error." [102]

The Commonwealth concedes that the trial court orally waived court costs at Sevier's sentencing hearing, and the imposition of costs in the final judgment is a clerical error.[103] Upon review of the record, we find this concession to be well founded; and we reverse the assessment of costs in the court's final judgment.

█ Regarding the award of a partial public defender fee, Sevier argues that the fee was not properly assessed because the trial court did not hold a hearing to determine his ability to pay such a fee, as required by KRS 31.211(1). He further argues that even if a proper hearing was held, the court could not have reasonably understood his financial situation as allowing a conclusion that he was capable of paying the partial fee. But, due to the inconsistency between the waiver of costs and the imposition of the public defender fee, we find it unnecessary to reach these issues.

---

**99.** To be sure, we are not insinuating that costs associated with the disposal or storage of various forms of contraband, such as non-volatile controlled substances and firearms, may be properly charged to defendants under KRS 532.032 and 532.350(1). Those types of contraband do not pose an immediate threat of harm to an officer handling them and have been routinely stored and destroyed by police departments for decades, so it cannot be said that those related expenses are extraordinary or outside the scope of typical police duties.

**100.** KRS 532.350(1)(a).

**101.** *Travis v. Commonwealth*, 327 S.W.3d 456, 459 (Ky.2010) (quoting *Wellman v. Commonwealth*, 694 S.W.2d 696, 698 (Ky.1985)).

**102.** *Roberts v. Commonwealth*, 410 S.W.3d 606, 611 (Ky.2013).

**103.** *See Cardwell v. Commonwealth*, 12 S.W.3d 672, 674 (Ky.2000) ("[T]he distinction [between clerical and judicial error] turns on whether the error was the deliberate result of judicial reasoning and determination, regardless of whether it was made by the clerk, by counsel, or by the judge.") (quotation marks omitted); *see also Machniak v. Commonwealth*, 351 S.W.3d 648, 654 (Ky.2011) ("The failure to accurately reduce to writing the trial court's intended sentence, a sentence which was evident from a review of the videotaped record and made known to both parties at the sentencing hearing, was a clerical error[.]").

Under KRS 23A.205(2), the imposition of court costs is mandatory upon conviction unless the trial court finds that the defendant is a "poor person" as defined by KRS 453.190(2). A defendant is a "poor person" and, thus, exempt from the mandatory taxation of costs if the court determines he is unable to pay costs "without depriving himself or his dependents of the necessities of life"[104] and will not be able to do so in the foreseeable future.[105] So, in waiving the otherwise mandatory assessment of costs against Sevier, the trial court must have undertaken an analysis of Sevier's finances and determined there was no "reasonable basis for believing that the defendant can or will soon be able to pay" court costs.[106] On the other hand, in order for a trial court to impose a public defender fee, the court must hold a non-adversarial hearing and conclude that the defendant is able to pay a partial fee for legal representation.[107]

It seems clear that the trial court's dual findings—that Sevier could both afford to pay a partial fee toward his representation but could not afford to pay court costs presently or in the foreseeable future—are inconsistent. In previously construing the interplay between the *in forma pauperis* statute, the DPA recoupment statute authorizing the partial fee, and the court cost statute, we recognized that "need is a matter of degree."[108] In so finding, we determined that a defendant's entitlement to the services of a public defender does not automatically render him exempt from the taxation of court costs because it requires a more serious showing of financial need in order to waive costs as compared to making a prima facie showing of need for a public defender.[109] We find that the same logic applies here.

Because the Commonwealth agrees that the trial court waived court costs at sentencing and did not conduct a hearing under KRS 31.211(1) to determine the propriety of a public defender fee, we hold that the trial court's waiver of court costs precludes the assessment of a partial public defender fee because the finding necessary to waive costs evinces the most serious form of financial hardship contemplated in our judicial-fee framework. So we reverse the imposition of both costs and fees and remand for the trial court to enter a final judgment consistent with this opinion.

### III. CONCLUSION.

For the foregoing reasons, we find that Sevier's and Baughman's convictions for manufacturing methamphetamine and possession of a methamphetamine precursor violate double jeopardy. So we vacate their convictions for the possession of methamphetamine precursor offense. But we affirm the remainder of their convictions and the imposition of joint-and-several restitution. We also reverse the trial court's assessment of court costs and fees against Sevier and Baughman. According-

104. KRS 453.190(2).

105. KRS 23A.205(2).

106. *Maynes v. Commonwealth*, 361 S.W.3d 922, 930 (Ky.2012) ("Without some reasonable basis for believing that the defendant can or will soon be able to pay, the imposition of court costs is indeed improper.").

107. KRS 31.211(1).

108. *Maynes*, 361 S.W.3d at 928 (internal quotation marks omitted).

109. *See id.* (holding that merely because a defendant is "needy" and, thus, entitled to the services of a public defender, he is not necessarily exempt from paying court costs because a determination that a party is "needy" requires less serious financial hardship than that which must be shown to waive costs under KRS 23A.205).

ly, we remand these cases to the trial court to enter new final judgments for each appellant consistent with this opinion.

All sitting. ABRAMSON, KELLER, NOBLE, SCOTT, and VENTERS, JJ., concur. CUNNINGHAM, J., concurs in result only.