# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED:  MARCH 23, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0311-MR

JUAN CHAIREZ                                          APPELLANT

|  | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE |
|  | NO. 15-CR-003148 |

COMMONWEALTH OF KENTUCKY                      APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Jefferson County jury found Appellant Juan Chairez guilty of sodomy in the first degree and four counts of sexual abuse in the first degree.  In accordance with his agreement with the Commonwealth, Chairez was sentenced to twenty-five years in prison.  He appeals the conviction and sentence as a matter of right.  We affirm the Jefferson Circuit Court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, after confiding in a relative, J.C.[1] reported to police that her father, Chairez, sexually assaulted her.  According to J.C.'s testimony, the sexual assault occurred on two occasions, once between September 1, 2012,

---

[1] We use initials to protect the identity of the victim.

and March 13, 2013, when J.C. was ten years old and once between October 1, 2013, and October 31, 2013, when J.C. was eleven years old. It was about seven months after the second incident that J.C. told the relative what happened. That disclosure led to an indictment against Chairez. After a three-day trial in May 2021,[2] and hearing testimony from Chairez on his own behalf, a jury found Chairez guilty of sodomy in the first degree and four counts of sexual abuse in the first degree. The jury found Chairez not guilty of rape in the first degree.

J.C. testified that on the first occasion of sexual abuse, she lived in a three-bedroom house with Chairez, her half-sister,[3] and a cousin. J.C. described her father, her primary caretaker, as a hard worker, her best friend, and as loving and nurturing. J.C. also testified that Chairez was a heavy drinker, that he drank every day, and that he often invited friends over to drink and record music in his basement studio. One night J.C. could not sleep because of the noise. She had gone to bed in her own bedroom, but that room had a vent connected to the basement. She moved to Chairez's room, got into bed, and went to sleep; according to J.C., she slept in Chairez's bed often, probably at least once a week. J.C. testified that she woke up to Chairez pulling down her shorts and underwear and that he touched her breasts, rubbed her clitoris, performed oral sex, and inserted his finger inside of her. When she started crying, Chairez stopped, turned on the light, and explained

---

[2] Chairez first went to trial in 2019 but a mistrial was declared.

[3] J.C. and her half-sister share a mother.

2

that he did not know it was J.C. in his bed. J.C. testified that Chairez cried and panicked and told J.C. not to tell anyone what happened or else he would go to prison.

On the second occasion, Chairez, J.C., and her half-sister were living at a friend's house. The three of them slept in the basement. J.C., unlike the other two, did not have a bed and she primarily slept on the couch. On the night of the second incident, Chairez told J.C. to sleep in his bed and he would sleep on the couch. J.C. woke up in the middle of the night when Chairez touched her clitoris. J.C. got up and moved to the couch.

The Commonwealth called multiple witnesses. Those witnesses included Chairez's cousin and two of his friends who testified in relation to J.C.'s allegations of abuse on the first night in question. The cousin testified that he heard noise coming from Chairez's bedroom and assumed Chairez was with his girlfriend. When he went to the cracked door, the room was dark but he could see a female sitting on the bed, and the door then closed. The cousin also testified that the next day Chairez told him that he was really drunk, he woke up and realized he was kissing J.C., it was an accident, he had talked with J.C. and everything was fine, and that Chairez told him not to tell anyone.

Chairez's two friends met with him after J.C. made her police report and asked Chairez about the allegations. According to their testimony, Chairez explained that after band practice, drunk, he went to bed and thought his girlfriend was in bed with him and stopped the sexual conduct when he discovered it was not his girlfriend that he was kissing, but J.C. One friend

3

testified that Chairez explained that he started kissing on J.C. Both friends testified that Chairez stated that he "went down" on J.C., which they interpreted as meaning he performed oral sex.

Chairez testified on his own behalf. He stated that at about ten o'clock he put J.C. in her bed. After band practice, drunk, he went to bed and passed out. The room was completely black, he rolled over, and thinking it was his girlfriend in bed with him, he began kissing on her, kissing her on the stomach. He testified that he did not engage in other sexual behavior because J.C. then stated, "Daddy, it's me!" Chairez testified that his friends must have misinterpreted what he told them about the events of that night. According to Chairez, he described to his friends the circumstances and events the same as Chairez explained them in his testimony. He insisted the second allegation never occurred at all.

After the jury reached its verdict, in accordance with his agreement with the Commonwealth, Chairez was sentenced to twenty-five years in prison. This appeal followed. Additional facts are presented below as necessary.

## ANALYSIS

Chairez argues on appeal that (1) he was denied a public trial when his family and supporters were denied the opportunity to attend the trial but a supporter of the prosecuting witness' choosing was permitted to attend during her testimony; (2) he was denied a fair trial and due process when the court allowed the jury deliberations to be broadcast on the court telephone line; (3) the trial court erred in admitting improper character evidence after the

4

Commonwealth had not provided notice to Chairez as required by KRE[4] 404; (4) the trial court erred by allowing a supervisor to testify to the contents of a video of a forensic interview; and (5) the lead detective improperly commented on Chairez's silence in violation of the Fifth Amendment.  We address Chairez's claims in turn.

## I.   Appellant's right to a public trial was not violated when the public was provided live access via telephone.

Prior to trial, the circuit court ordered that no members of the public be permitted in the courtroom during trial.  The three-day trial began May 25, 2021.  At that point, the Kentucky Supreme Court allowed jury trials, which had been halted due to the COVID-19 pandemic,[5] to resume if the trial court in its discretion considered it advisable after considering local public health conditions and relevant health and safety requirements.[6]  The circuit court implemented COVID-19 safety protocols.[7]  The circuit court placed physical

---

[4] Kentucky Rule of Evidence.

[5] COVID-19 is a respiratory disease caused by SARS-CoV-2, a coronavirus discovered in 2019.  Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/dotw/covid-19/index.html (last accessed Feb. 20, 2023).

[6] Kentucky Supreme Court Administrative Order 2021-17 pertinently states:

"Jury trials may resume if the trial judge determines in his or her discretion, after having considered local public health conditions and the health and safety requirements established by the Supreme Court in Administrative Order 2021-16, that it is advisable."

[7] Kentucky Supreme Court Administrative Order 2021-16 pertinently states:

Judges retain the discretion to require individuals in the courtroom to use facial coverings generally or in specific cases, particularly cases involving persons who are at an increased risk of severe illness from COVID-19.

distance between the jurors, seating the jury members across the courtroom's public gallery during the trial; the trial court also kept the jury in the secured courtroom during deliberation.

Before the trial began, the Commonwealth requested a support person's presence in the courtroom when J.C. testified. The circuit court granted that request, even when it was clarified that J.C. was no longer a minor. Citing his right to a public trial, Chairez then objected to not being allowed a person in the courtroom like J.C. was being allowed. The circuit court denied Chairez's request. Before closing arguments, Chairez renewed his request that some family members be allowed into the courtroom. The circuit court also denied that request.

The Sixth Amendment to the United States Constitution[8] and Section Eleven of the Kentucky Constitution[9] guarantee the criminal defendant a right to a "public trial."[10] "The central aim of a criminal proceeding must be to try the accused fairly . . . ."[11] "The right to public trial is, of course, primarily for

---

. . .

Judges retain the discretion to limit the number of people or to enforce social distancing in a courtroom as health and safety conditions or circumstances necessitate.

[8] The Sixth Amendment to the United States Constitution states in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

[9] Section Eleven of the Kentucky Constitution states in pertinent part: "[I]n prosecutions by indictment or information, [the accused] shall have a speedy public trial by an impartial jury of the vicinage."

[10] *Crutcher v. Commonwealth*, 500 S.W.3d 811, 813 (Ky. 2016).

[11] *Waller v. Georgia*, 467 U.S. 39, 46 (1984).

the benefit of the accused, allowing the public to see that he is 'fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'"[12]

> The open trial . . . plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.[13]

In *Crutcher v. Commonwealth*[14] this Court recognized the test articulated by the United States Supreme Court in *Waller v. Georgia*[15] as the test for determining whether a defendant's constitutional right to a public trial is violated when the courtroom is closed over a defendant's objection.[16] A public

---

[12] *Crutcher*, 500 S.W.3d at 813-14 (quoting *Waller*, 467 U.S. at 46). A three-member concurring opinion in *Crutcher* discusses a subtle difference between the Sixth Amendment to the United States Constitution and Section Eleven of the Kentucky Constitution. The concurring opinion states that through its language, Section Eleven the Kentucky Constitution does not create a right that belongs exclusively to the defendant but "creates a right that belongs to the people, anyone of the general citizenry, to assure that no criminal adjudications take place behind closed doors regardless of the defendant's preference on the subject." *Id.* at 817.

[13] *Press-Enter. Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 508 (1984) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569-71 (1980)).

[14] *Crutcher* decided that a defendant may waive his right to public trial by failing to object to the closure of the courtroom and preserving the issue for appeal.

[15] 467 U.S. 39 (1984).

[16] *Waller* stated "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public," 467 U.S. at 46, and concluded that the tests set out in First Amendment precedent, *Press–Enterprise* and its predecessors,

7

trial violation does not occur when (1) the party seeking to close the proceeding advances an overriding interest that is likely to be prejudiced without the closure, (2) the closure is no broader than necessary to protect that interest, (3) the trial court considers reasonable alternatives to closing the proceeding, and (4) the trial court makes findings adequate to support the closure.[17]

Chairez complains that the circuit court did not analyze the three *Waller* factors and did not make findings to support its reason to close the courtroom to the public. Chairez argues that even if the COVID-19 pandemic was sufficient justification for some restrictions on courtroom attendance, the circuit court did not consider the narrowest method of protecting the health and safety of the jurors and others necessarily present for the trial. Chairez asserts that since the jury box was empty, a limited number of the public could have been permitted to watch the trial from there and those members could have been subject to reasonable restrictions such as masking, social distancing, and proof of vaccination. Chairez cites cases from other jurisdictions to show that such restrictions were used in courtrooms during this stage of the pandemic. Chairez also argues that allowing J.C.'s support person in the courtroom during her testimony showed that safe alternatives

---

also apply to the Sixth Amendment. 467 U.S. at 44-47. Using that test, *Waller* concluded that closure of the entire suppression hearing was unjustified.

[17] *Id.* at 48.

existed for allowing the presence of other members of the public in the courtroom throughout the trial.[18]

The Commonwealth counters that Chairez's contention that the circuit court did not follow *Waller* is without merit.[19]  Beginning with Chairez's assertion that the circuit court did not make findings which support closing the courtroom to the public, the Commonwealth asserts that this Court's COVID-19 administrative orders provided guidance to the trial court for addressing health and safety concerns in the courtroom and the administrative orders were sufficient to satisfy *Waller*'s requirement, and those findings only add to the circuit court's explanation of the closure on the record before the

---

[18] We do not address Chairez's unpreserved argument that the effect of the circuit court allowing a spectator in the courtroom during J.C.'s testimony alone was to send an improper message to the jury to value J.C.'s testimony above other witnesses.  Chairez does not mention in his brief where the circuit court placed the support person and whether any attention was brought to the person.

[19] The Commonwealth's lead argument is that the facts of this case do not implicate a constitutional violation.  The Commonwealth emphasizes the difference between a trial in which the public is denied total access to the proceedings, like in *Waller*, and a trial in which the public is only denied physical access to the proceedings.  The Commonwealth contends that in this case, while the public was denied physical access, the public's access and ability to check that the defendant was "fairly dealt with and not unjustly condemned" was maintained by hearing the audio broadcast of the proceedings by telephone and by the opportunity to obtain the video recording of the proceedings afterward.  The Commonwealth cites *Press-Enterprise*, 464 U.S. 501 (stating that "[w]hen limited closure is ordered [for *voir dire*], the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests"), and this Court's unpublished decision, *Henson v. Commonwealth*, 2020-SC-0343-MR, 2021 WL 5984690 (Ky. Dec. 16, 2021), discussed below, as observing that the constitutional inquiry is not so much about whether spectators have unfettered physical access to the courtroom, but whether they can access the proceedings in a meaningful way.  We refrain from addressing this argument concerning interpretation of the constitutional right to public trial in this case.  As in *Henson*, we consider the *Waller* factors for determining whether a Sixth Amendment constitutional violation occurred.

trial began. The circuit court explained at the outset of the trial that the jury box did not provide enough space to distance the jurors properly so the jurors would be seated in the public gallery. The circuit court stated that for the safety of the jury, and counsel and the parties, spectators were not allowed in the courtroom during trial. Although the circuit court considered a larger room in which to hold the trial, the court explained that its configuration did not allow quality preservation of the record because of poor audio recording and that the room still would not have been large enough for spectator attendance. The circuit court also explained that a public trial was being held as spectators had access to the trial, i.e., audio access was provided through a dedicated telephone line, and it would remain open so anyone could listen to the trial, and the video recording of the trial would be available for anyone afterward.

In regard to Chairez's argument that the circuit court did not consider whether closing the courtroom to spectators was the "narrowest method of protecting" against the health and safety risks of COVID-19, the Commonwealth states that Chairez ignores that the circuit court expressly considered the size of the courtroom and how the jury needed to spread out when deciding whether spectators could attend. The circuit court also considered moving to a larger courtroom but determined that doing so was not possible because the record would not be adequately preserved. The Commonwealth further argues that the fact other courts with different and unknown physical limitations could allow limited spectators during a trial has no bearing here as the trial court was required to consider local health

10

conditions and make health and safety decisions based upon its facilities. Lastly, the Commonwealth argues that the fact that the circuit court allowed a single individual into the courtroom during a limited portion of the testimony to facilitate a vulnerable witness's ability to testify does not undermine the court's judgment that opening the door to spectators for the entire trial was not possible.

*Henson v. Commonwealth*,[20] deals with issues similar to those raised by Chairez and although unpublished, offers guidance in this case. In *Henson*, the trial occurred during the beginning of the pandemic, and in compliance with this Court's administrative order, the trial court prohibited spectators from coming into the courtroom.[21] The Court acknowledged that the usual circumstance for application of the *Waller* test – judicial discretion – was not present because of the Court's order that ongoing trials could only proceed to resolution without interruption by closure of the courtroom to spectators.[22] Thus, while faced with the imperfect application, the Court considered whether it fulfilled the *Waller* test when issuing Administrative Order No. 2020-08. The Court concluded the closure was constitutional.

In *Henson*, in terms of *Waller*'s second factor, whether the closure was narrowly tailored to the interest threatened, the trial court, as it saw fit, could reschedule the trial underway or restrict the public from the courtroom. When

---

[20] 2020-SC-0343-MR, 2021 WL 5984690 (Ky. Dec. 16, 2021).

[21] *Id*. at *2.

[22] *Id*. at *3.

11

considering *Waller*'s third factor, whether there were reasonable alternatives to the closure of the proceeding, we stated that closure of the courtroom was the most feasible way to continue the work of the judiciary while protecting employees, officials, and litigants from the threat of COVID-19.[23] We noted that when *Henson* was rendered in December 2021, technologies were available that provide live streaming of proceedings to any computer or phone with internet access, but Kentucky courts were not equipped with such technology at the beginning of the pandemic.[24]

In regard to Henson's argument that the jury's inability to see his family members' and friends' support for him unfairly prejudiced the jury against him, we found that argument to be unpersuasive.[25] We considered that the guarantee of a public trial is intended to allow the public to "see for themselves how their laws are impartially applied"[26] and concluded that purpose was adequately served by the availability of the digital recording of the trial to the public after the conclusion of the trial.[27]

In this case, Chairez's focus in on the second *Waller* factor, which, while interrelated, is distinguished from the third factor. The question under the second factor is whether the circuit court abused its discretion by not allowing

---

[23] *Id.*

[24] *Id.*

[25] *Id.* at *4.

[26] *Id.* (citing *Waller*, 467 U.S. at 46; *Lexington Herald Leader Co., Inc. v. Tackett*, 601 S.W.2d 905, 907 (Ky. 1980)).

[27] *Id.*

12

spectators into the courtroom throughout the whole trial.[28]  While acknowledging the public health and safety risks associated with COVID-19, Chairez argues that the circuit court went too far and could have allowed a limited number of people to attend who met the health measures for mitigating COVID-19 spread, measures which could have been imposed by the circuit court.

At the time of Chairez's trial Administrative Order 2021-17 allowed trial courts the discretion to resume jury trials after having considered local public health conditions and the health and safety requirements established in Administrative Order 2021-16.[29]  Administrative Order 2021-16 allowed trial courts discretion "to limit the number of people or to enforce social distancing in a courtroom as health and safety conditions or circumstances necessitate" and "to require individuals in the courtroom to use facial coverings."[30]  Courts were also encouraged to continue hearing civil and criminal matters using available telephonic and video technology to conduct proceedings remotely.[31]

The circuit court's goal was to balance the defendant's public trial right and the objective of stemming the spread of COVID-19.  Under the "narrow tailoring" requirement, the question is whether it was necessary to restrict the public from the entire trial.  There were two constants which restricted the

---

[28] *See Waller*, 467 U.S. 48-50 (finding that the closure of the entire suppression hearing plainly was unjustified).

[29] See note 6, *supra.*

[30] See note 7, *supra.*

[31] Kentucky Supreme Court Administrative Order 2021-16.

circuit court's flexibility of allowing the public into the courtroom over the course of the trial - mitigation of the spread of the respiratory virus through public health best practices and courtroom space. As the Court's administrative orders reflect, the trial court was given discretion to determine space available for public use after accounting for and allowing space for those required to be present in the courtroom during the trial, and if space remained available for the public, what introduction of the public meant for the public health interest of those required to be in the courtroom. Here, the circuit court explained on the record that after dedicating space to the jury in the public gallery, space did not remain for spectators and their attendance otherwise would impede the public health goal. Furthermore, given the knowledge that the risk of spreading COVID-19 increases as more people gather in a confined space there was a rationale recognized within the Court's administrative orders and the circuit court's explanation for public restriction which would allow J.C.'s support person be in the courtroom for a limited duration but still exclude others for the duration of the trial.

Thus, in accordance with this Court's administrative orders, the circuit court exercised its discretion and limited the number of people in the courtroom by enforcing social distancing during the trial, a reasonable means of minimizing health risks from COVID-19. Furthermore, as required under the third *Waller* factor, the circuit court considered reasonable alternatives to closure and used an alternative which allowed the public to access the trial contemporaneously. Hence, the public was required to attend the trial

14

telephonically. While the public was not able to see the trial live, the public remained able to hear a live feed of the trial and judge whether standards of fairness were being observed.

We conclude the circuit court set forth on the record the reasons justifying the restriction of the public physically from the courtroom and the condition was no broader than necessary to accomplish its purpose of stemming the spread of COVID-19. Thus, we cannot conclude that the circuit court abused its discretion by ordering the courtroom closed to the public during Chairez's trial.

**II.** **Appellant was not denied a fair trial when the telephone line dedicated for public access remained on for a short period after the jury began deliberating.**

At the close of the case, the jury was secured in the courtroom to deliberate. After the jury began deliberating, the circuit court was made aware that the public telephone line remained open. The jury had deliberated 10-12 minutes by the time the deputy instructed the jury to stop deliberations. The circuit court then ensured that the telephone line was disconnected. The jury resumed deliberations.

Chairez moved the circuit court for a new trial on the basis that he had been denied due process and a fair trial because the jury deliberation was not secret. The circuit court conducted an evidentiary hearing during which three witnesses testified. Each witness testified to the statements heard distinctively and to hearing background voices. The witnesses estimated that they listened

15

to the jury between 5-8 minutes. Chairez now argues that the open telephone line created pressure on the jury to find him guilty.

"[T]he primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence."[32] As we recognized in *Sevier v. Commonwealth*, "[t]he presence of a 'stranger' during deliberations is often viewed as a threat to the jury's secrecy and ability to engage in free discussion as a cohesive group without worry of later dissemination."[33] While an outside intrusion may occur in different ways,[34] "the ultimate inquiry [is]: Did the intrusion affect the jury's deliberations and thereby its verdict?"[35]

While it is clearly an error for the public to hear the jury's initial deliberation, under the circumstances of this case, we conclude it was harmless error. A preserved, non-constitutional error is harmless "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ."[36]

The jury did not know that the telephone line remained open during its initial deliberations. The circuit court then turned the telephone off without

---

[32] *United States v. Olano*, 507 U.S. 725, 737–38 (1993).

[33] 434 S.W.3d 443, 463 (Ky. 2014).

[34] *See Olano*, 507 U.S. at 738 (describing outside intrusion cases generally analyzed for prejudicial impact upon the jury).

[35] *Id.* at 739; *see Sevier*, 434 S.W.3d at 463 (stating harmless-error rule applied for preserved issue of whether a fully participating thirteen-member jury contained a stranger to the proceedings during its deliberation).

[36] *Crossland v. Commonwealth*, 291 S.W.3d 223, 233 (Ky. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750 (1946)).

16

telling the jury members what happened. As the Commonwealth asserts, no harm or prejudice may be found by something which the jury was not aware.

### III. Admission of J.C.'s testimony about her relationship with Appellant, if error, was harmless error.

J.C. testified about her relationship with Chairez. She expressed that Chairez talked with her like a friend and as an example, explained that he told vulgar jokes to his friends in her presence. J.C. also testified about how she came to be in Chairez's bed on the first occasion of the alleged abuse. When asked if she had slept in her father's bedroom before, J.C. answered, "very often." J.C. described that she slept in Chairez's bed at least once a week, that it was very common, and it was something that she viewed as love, nurturing, affection, which she craved, and it was another aspect that made their relationship so much closer. The circuit court overruled Chairez's objections to J.C.'s testimony.

Chairez complains that the Commonwealth did not provide KRE 404(b) notice that it would introduce this evidence that had the tendency to demonstrate a character of the defendant consistent with committing the charged sex offenses. Chairez particularly argues that the testimony depicted Chairez as sexually inappropriate with his daughter at times other than those alleged in the indictment and the Commonwealth sought to use the evidence to make it believable that he would commit the charged sex offenses with J.C. Chairez also argues that the vulgar jokes and the other occasions J.C. slept in Chairez's bed were not charged as crimes and were not relevant to any of the issues the jury decided at trial.

KRE 404 restricts the introduction of character evidence and evidence of other crimes, wrongs, or acts admitted for the purpose of "proving action in conformity therewith," its purpose being "to prohibit unfair inferences against a defendant."[37]  However, KRE 404 has exceptions.[38]  Under KRE 404(b), other crimes, wrongs, or acts may be admissible:

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

While quoting parts of KRE 404 viewed to be pertinent, including its exceptions, Chairez states generally that the testimony by J.C. constituted improper character evidence and prior bad acts evidence which does not fall within any of the exceptions contained in the rule.  In rebuttal, the Commonwealth argues that not all evidence which paints the defendant in a poor light amounts to bad-acts evidence under KRE 404(b).  Citing *Graham v. Commonwealth*[39] for the premise that in order to qualify as bad-acts evidence,

---

[37] *Conrad v. Commonwealth*, 534 S.W.3d 779, 781 (Ky. 2017).

[38] KRE 404(a)(1),(2),(3); KRE 404(b)(1),(2).

[39] 571 S.W.3d 575, 580 (Ky. 2019).  In *Graham*, the defendant was convicted of sexually abusing several boys.  The defendant objected, under KRE 404(b), to the prosecution admitting evidence that the defendant took children on fishing trips.  The defendant argued that the evidence was irrelevant to the charges that he had sodomized and sexually abused two boys in bedrooms.  He argued that the evidence about taking the boys on fishing trips was only to show his criminal disposition and was unduly prejudicial.  This Court stated:

> there is nothing inherently wrong about taking underprivileged children on fishing trips.  It does not amount to evidence of other crimes, wrongs,

18

the evidence must show that the defendant has done something "inherently wrong" in the past, the Commonwealth asserts that the testimony which Chairez complains about, the vulgar jokes and J.C. frequently sleeping in the same bed with her father, does not fall within the scope of KRE 404(b).

The Commonwealth further contends that the prosecution did not offer the vulgar joke testimony to prove that a person who makes vulgar jokes around kids is the same kind of person who might molest a child. Instead, the testimony arose from a line of questions aimed at proving that Chairez and J.C. were close prior to the abuse, which made it unlikely that J.C. would have made up lies about Chairez. Nevertheless, the Commonwealth argues that any error was harmless error, and we agree. Upon review of the evidence, we can say with fair assurance that the jury's verdict was not substantially swayed by J.C.'s testimony that her father told vulgar jokes in her presence.[40]

The Commonwealth, again citing *Graham*, also states that there is nothing inherently wrong about a child sleeping in a bed with her parent, that the Commonwealth did not introduce the testimony to prove Chairez's character, but instead, the testimony established that Chairez would not have

---

or acts as contemplated by KRE 404(b). This evidence was not presented to "prove the character of [Appellant] in order to show action in conformity therewith." KRE 404(b). It was not presented to prove that Appellant's character was that of a man who takes children fishing in order to prove that he took Joseph and Lonnie fishing. While it is true that Appellant was accused of sexually abusing other young boys on fishing trips, no testimony or evidence of those acts of abuse was presented; nor was an allegation that he had abused these or other boys while on fishing trips. *Id.*

[40] *Crossland*, 291 S.W.3d at 233.

been surprised to find J.C. in his bed. The Commonwealth argues that nevertheless, this testimony, too, if erroneously admitted, would be harmless error.

The prosecution did not introduce any evidence that Chairez abused J.C. during any of the prior times that J.C. slept in his bed. J.C.'s testimony that she often slept in the same bed may have cast doubt on whether Chairez really believed that he was with his girlfriend on the first night in question. Given the testimony the jury heard from J.C. about the abuse and corroborating testimony from Chairez's friends, whether J.C. regularly slept in Chairez's bed before the alleged abuse occurred, that testimony could not have substantially swayed the jury's verdict.[41] We conclude that if it was error to admit the testimony, it was harmless error.

## IV. The Confrontation Clause is not implicated by testimony regarding J.C.'s forensic interview.

A supervisor at the Family and Children's Place testified on behalf of the Commonwealth. The supervisor described the Family and Children's Place as a child advocacy center, a neutral entity, where medical exams and forensic interviews are conducted of alleged child abuse victims. J.C. made a disclosure to the forensic interviewer. J.C.'s interviewer was no longer employed by the center at the time of trial. Before her testimony, the supervisor watched the video of J.C.'s interview; the supervisor was employed at the center at the time J.C. was interviewed.

---

[41] *Id.*

The supervisor described the forensic interview process generally and answered questions regarding the interview process with J.C. Chairez objected to the supervisor's testimony on the basis that the supervisor did not have personal knowledge of the interview and to the supervisor improperly bolstering the veracity of J.C.'s forensic interview. On appeal, Chairez claims the forensic interview was testimonial in nature and therefore the interviewer's statements, comments, and questions, relayed through the supervisor's testimony, were barred by the Confrontation Clause. The Commonwealth argues that Chairez's Confrontation Clause claim is not preserved, and is subject to palpable error review, but under any standard of review, there is no violation of the Confrontation Clause here.

"[T]he Confrontation Clause precludes admission of the statements of a witness unavailable to testify at trial if the witness' out-of-court statements were 'testimonial,' unless the accused had a prior opportunity to cross-examine the witness."[42] As noted above, Chairez complains that the interviewer's statements, comments, and questions, relayed through the supervisor's testimony are barred by the Confrontation Clause. However, Chairez does not identify any specific testimony by the supervisor in which the supervisor mentioned any statements, comments, or questions made by the interviewer.

The Commonwealth points out that the supervisor never testified about the specific questions the interviewer asked, but the kinds of questions the interviewer asked, such as whether they were open-ended. Further, the

---

[42] *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 242 (Ky. 2009).

21

supervisor did not testify about the interviewer's statements, observations, or opinions. The supervisor explained, if an interviewer were to form an opinion about alleged abuse, that interviewer is never to reveal that opinion. Accordingly, the supervisor's testimony related nothing about the interviewer's opinions which may or may not have existed in regard to J.C.'s allegations.

This Court's review of the record also reveals no testimony by the supervisor which may be viewed as admitting the interviewer's out of court statements, negating the usual accompanying question of whether the out-of-court statements were testimonial. We conclude there is no Confrontation Clause violation under these facts.

## V. Appellant's Fifth Amendment right was not violated.

The detective in this case testified at trial. The detective testified that she called Chairez and left a voice mail, but she never had actual physical or verbal contact with Chairez. Chairez objected to this testimony, arguing it implied that he did not make a statement, it was an implied comment on his silence, and it violated Chairez's Fifth Amendment right.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[43] In relation to that right, the Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody."[44]

---

[43] U.S. Const. amend. V.

[44] *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009).

22

We do not agree with Chairez that the detective's testimony, testimony given in regard to whether the detective could identify Chairez in the courtroom,[45] was an improper comment on Chairez's silence. Nevertheless, even if it were, "[n]ot every isolated instance referring to post-arrest silence will be reversible error."[46] Typically, reversal is warranted where the prosecutor has repeatedly mentioned and emphasized an accused's post-arrest silence.[47] In this case, any improper comment was transient and was not emphasized. Considering the evidence properly presented to establish Chairez's guilt, we cannot conclude that Chairez was prejudiced by the detective's testimony.[48] Any error was harmless beyond a reasonable doubt.[49]

## CONCLUSION

For the foregoing reasons, the Jefferson Circuit Court's judgment is affirmed.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert, Nickell, JJ.; concur. Thompson, J.; concurs in result only.

---

[45] *See Ragland v. Commonwealth*, 191 S.W.3d 569, 589-90 (Ky. 2006).

[46] *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983).

[47] *Id.*

[48] *See Baumia v. Commonwealth*, 402 S.W.3d 530, 539-40 (Ky. 2013) (citing factors in *United States v. Velarde–Gomez*, 269 F.3d 1023, 1034 (9th Cir. 2001)).

[49] *Chapman v. California*, 386 U.S. 18, 24 (1967).

23

COUNSEL FOR APPELLANT:

Joseph R. Eggert
Michael L. Goodwin


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky


Matthew F. Kuhn
Assistant Attorney General